JAMES PAMOPLAS, PROSECUTOR, v. REV. CHARLES MARINOS AND THE POLICE COURT OF THE CITY OF PASSAIC, RESPONDENTS.

Argued April 7, 1923—Decided July 28, 1923.

A church edifice while in a sense public for the use of the congregation, is, nevertheless, under the control of trustees, vestrymen and directors, and is not a "place" within the meaning of a municipal ordinance prohibiting any improper noise, riot, disturbance, &c., in any place in the municipality, such prohibition being confined to acts done in a public place in general use by all citizens.

On *certiorari.*

For the prosecutor, *Nicholas O. Beery.*

For the respondents, *Weinberger & Weinberger.*

Argued by consent before

MINTURN, J. The irate prosecutor apparently was imbued with the complacent and soul satisfying notion that the aegis of American liberty carried with it as a necessary appendage, the inestimable and consoling right of obtruding himself into a body of worshippers, and there publicly excoriating the .

officiating pastor in language so sulphuric and esoteric that lexicographers refuse to recognize it, and holy writ expressly denounces it. For this breach of decorum and violation of the local law he was unceremoniously brought before the recorder of Passaic, charged with disorderly conduct, in that he had violated the seventy-second section of the City Ordinances, which reads as follows:

"That any person who shall in any place in the city of Passaic make, aid or assist in making any improper noise, riot, disturbance or breach of the peace or shall behave in a disorderly manner, or make use of obscene or profane language, shall each be liable to a penalty of five dollars for every offense."

He insisted, however, that while there were other laws to which he might be amenable, he was not guilty of disorderly conduct in a public place, since a church within the meaning of the ordinance was not a public place, and the jurisdiction of the city authorities did not extend to places not public. But the recorder thought otherwise, and hence this appeal. If the principle advanced in *State* v. *Gross,* 96 *N. J. L.* 401, and *State* v. *Lynch,* 23 *N. J. L. J.* 45, embody the correct doctrine upon this subject, the prosecutor is correct in his contention.

The test contained in those cases is whether the place is one in general use by all citizens, in which all have an equal right of passage and repassage at will, so long as they conduct themselves conformably to police regulations in the general public interest. In the case first cited the prosecutor was a passenger upon a railroad train, who insisted upon keeping his baggage within his view, and upon talking to the conductor as loud as he deemed necessary for the purpose of emphasizing a passenger's rights.

In the second case cited the offender engaged in the long-lost art of exercising his eloquence *ad lib.* in a public barroom. Both of these *quasi*-public places were held not places of a public character, within the meaning of the Disorderly act and the city ordinance. The same rule applies here, since a church edifice while in a sense public for the use of the con-

gregation, and those seeking its kindly shelter and repose for religious purposes, is, nevertheless, under the control of trustees, vestrymen and directors, quite apart from the body public, and the public officials, so as not to endow it with the title of a "place" within the municipal jurisdiction. But it is conceivable that the prosecutor in the tensity of his spiritual condition in these days of social transition, had lost his point of view and conceived the church to be a public place.

It is within the possibilities that he conceived the church edifice as the only existing substitute for the traditional public house or wayside inn of another day—to which the weary wayfarer or the tired legal advocate, the enervated statesman, and the general disgrunted public were wont to resort, as a stimulating and hospitable refuge, the last resort in all causes, for the purpose of indulging their surplus eloquence upon all things human and mundane to which they were opposed.

> "Where village statesmen
> Talked with looks profound
> And news much older than their ale
> Went round."

To his weary and unsophisticated mind there may have arisen as in a vision the public house of the golden age of the British *literati;* where Junius indited his letters and where Johnson, Burke, Goldsmith, Boswell and the rest of that brilliant galaxy sported in literary revelry, for the delectation of ages unborn; where under Hibernian auspices Whiteside, Philips, Curran and Lord Avonmore spent delightful periods reviving "those Attic nights and those refections of the gods," where in our own national life the poetry of Longfellow, Whittier and Poe was in some measure cast; and where Webster, Calhoun, Clay and Hayne apostrophized in spare nocturnal moments the grandeur of our national life. But when like an iridescent dream this delectable vision had vanished, and the prosecutor stood in the ominous atmosphere of the Recorder's Court, like the famed Roman lamenting the decadence of the republic, he might well have protested, *O tempora! O mores!*

The reality, however, was closed to him forever, and no refuge for the afflicted but the church seemed open to him; and to this he resorted, and there indulged sacriligiously the verbal consolations of the earlier day.

But while his conviction was erroneous, the prosecutor's conception of a public place was equally erroneous; for conceding the inconvenience, the hardships and the handicaps, to which modern progressive civilization has subjected the distressed denizen, who, sometimes like the cave man, inherits the appetites and ambitions of an earlier age, it is manifest that the time has not yet arrived when the sacred precincts of the church can be conscripted, converted and made to do service for the lost Walhalla.

For these reasons the judgment of conviction is vacated.